IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2003 Session

## ALMA D. (MURRAY) NEISWINTER v. MARK K. MURRAY

**An Appeal from the Chancery Court for Williamson County**
**No. 24564     Timothy L. Easter, Chancellor**

**No. M2002-02345-COA-R3-CV - Filed December 31, 2003**

This appeal involves modification of child custody and child support, and contempt for failure to pay the support. When the mother and the father were divorced, the mother was designated as the primary residential parent. Three years later, custody was changed to the father. Subsequently, the mother filed a petition for change of custody and for modification of her child support obligation. The State later filed a petition on behalf of the father to hold the mother in criminal contempt for failure to pay child support. After a trial on both the mother's petition for change in custody and support and the State's petition for contempt, the trial court denied the mother's petition for custody, reduced the support retroactively because one child no longer lived with the father, and granted the State's petition, holding the mother in contempt. As punishment for the contempt, the trial court sentenced the mother to forty days in prison. From that order, the mother now appeals. We affirm the trial court's determinations regarding child custody and child support. We reverse the trial court's finding of criminal contempt, finding that the mother had in fact paid all of the required child support, based on the trial court's retroactive order reducing the child support obligation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed in Part and Reversed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Ernest W. Williams and Anna E. Freeman, Franklin, Tennessee, for the appellant, Alma D. (Murray) Neiswinter.

P. Edward Schell, Franklin, Tennessee, for the appellee, Mark K. Murray.

### OPINION

Petitioner/Appellant Alma D. (Murray) Neiswinter ("Mother") and Respondent/Appellee Mark K. Murray ("Father") divorced (for the second time) in 1997. They had two sons, Clint Murray ("Clint"), born July 5, 1985, and Mark Murray ("Mark") born June 26, 1988. Since the divorce, both

Father and Mother have remarried. Father is now married to Lisa Murray ("Lisa"), and Mother is married to Patrick Neiswinter ("Patrick").[1]

In the parties' marital dissolution agreement, they shared joint custody of their sons. Mother was designated as having primary physical custody. Father later filed a petition for a change of custody, which was granted by this Court on June 27, 2000. *See Murray v. Murray*, No. M1999-02081-COA-R3-CV, 2000 WL 827960 (Tenn. Ct. App. June 27, 2000).

From June 2000 to March 2002, Father had custody of both boys. Clint, however, developed substantial problems, and on March 16, 2002, Clint was sent to live at the Tennessee Baptist Children's Home ("Children's Home") in Brentwood, Tennessee, pursuant to an order of the Williamson County Juvenile Court. Clint was placed into State custody because of several juvenile court petitions filed against him, many of which were filed by Father, including drug-related charges, charges of vandalism, and runaway charges. Mark continued to live with Father.

On February 2, 2001, while Father had custody of both boys, the trial court entered an order requiring Mother to pay Father $678 per month in child support in accordance with the guidelines.[2] On approximately June 1, 2001, Mother filed a petition for change of custody and for reduction of her child support obligation.

Mother failed to comply with the February 2001 child support order. By January 2002, Mother had accrued a child support arrearage totaling $6,374. At that time, she was held in criminal contempt of court for her noncompliance with the February 2001 order. As punishment for the contempt, Mother served thirty days in jail, from January through part of February 2002.

The following month, February 2002, Mother paid the full amount of support. In March, Mother paid $25. On March 15, 2002, the State filed a petition on Father's behalf to hold Mother in criminal contempt, because the March payment was not made when due on March 1, 2002.[3] The next day, on March 16, 2002, Clint was placed into State custody and began living at the Children's Home. Thereafter, Mother paid $125 in April, $830 in May, and $878 in June, leaving a total

---

[1]Mother and Neiswinter have a son, born May 26, 2001, who was about thirteen months old at the time of the trial.

[2]The February 2, 2001 order was not included in the record on appeal, but the parties do not dispute that Mother's obligation to Father was $678 per month per that order.

[3]In the State's March 2002 petition to show cause, the State alleges that Mother has failed to make child support payments in compliance with an order entered by the trial court on January 17, 2002. However, there is no such order dated January 17, 2002 in the record. Furthermore, neither the parties nor the trial court acknowledge the existence of a January 2002 order, and the trial court's finding of contempt was based on Mother's noncompliance with the original February 2001 order awarding $678 per month in support. Nevertheless, it makes no practical difference whether the contempt order at issue in this case was based on a February 2001 order or a January 2002 order. We note this distinction, however, for the sake of clarity in the record.

undisputed arrears of about $814.[4] During this time, her court ordered support remained $678 per month.

On June 23, 2002, the trial court conducted a bench trial on both Mother's June 2001 petition for a change in custody and a reduction in support and the State's petition for contempt. At the time of trial, Clint was almost sixteen (16) years old and Mark was just turning fourteen (14).

At trial, Father testified that Clint was living in the Children's Home, and that Mark remained in Father's home. In his household, Father said, he required the boys to do chores like making up their beds, taking out the trash, brushing their teeth, and doing their homework. Mother, he claimed, did not impose those rules, and this made enforcement of them difficult at his house.

Father said that, after primary custody of the boys was changed from Mother to him, Clint repeatedly tried to run away from home, because he wanted to live with Mother. Father claimed that it was easier for Clint to get what he wanted from Mother than from Father. Father agreed that his relationship with Clint had been "unsettled" for a long time, and that Clint did not want to follow simple household rules. For example, Father did not permit Clint to stand on the street corner and have eighteen and nineteen year olds pick him up in their cars and take him places. Father said that he had found cigarettes, alcohol, and drugs in his home that he believed were brought there by Clint. Father also said that he would not allow Clint to continue his relationship with a nineteen-year-old woman, Janet Garcia ("Garcia"), because Clint was only sixteen. Father said that, Mother, on the other hand, not only approved of the relationship but also allowed Garcia to spend the night at her house with Clint. Father described a list that Clint made of things that he would like to be able to do while living with Father, including staying out late and going places with friends his Father did not know, and also carrying his own money. Given Clint's past problems with buying drugs and inappropriate music, Father objected to Clint carrying his own money.

Father testified that Mark had had difficulty in school, but said that this had always been the case. Father got a tutor for Mark, but said that Mother refused to pay for half of the cost. Father testified that Mark's attendance in school had improved dramatically since Father was designated the primary custodian, because he made Mark go to school. In contrast, Father said, when Mark lived with Mother during her summer visitation, Mark missed the first two days of summer school and missed a dental appointment that had been scheduled for six months.

Despite this, Father said he had given Mother visitation beyond the amount that was ordered by the trial court. He claimed that, when Mother had been the boys' primary custodian, he made his child support payments "religiously" and even gave Mother money for extra expenses. Father was unaware of any of the health problems that Mother claimed, stating that "she's healthy as a horse."

---

[4]According to this Court's calculation, Mother would be $854 in arrears. In the trial court, however, the parties agreed that the arrears totaled $814.

Mother also testified at trial. She said that her husband, Patrick, was transferred to Ohio by his employer in January 2002. Mother said that, after she was released from jail in February 2002 for the contempt charge, she visited Patrick for one week. Since her petition for a change of custody was filed in June 2001, Mother said, she had had two miscarriages and had been "in and out of the hospital about four times." Mother claimed that her longest stay in the hospital was once for about two or three days, and that she did not stay overnight in the hospital for procedures related to her miscarriages. At the time of trial, Mother said, she had been employed at World's Gym as the nursery director for about one month earning $11 per hour.

Mother testified that Father had made her relationship with the boys difficult. She asserted that she had an excellent, healthy relationship with the children, and that her husband, Patrick, treated both of the boys with love and respect. When asked about her household rules, Mother said that the children were not allowed to disrespect her, and that they were not free to leave the house and return whenever they wanted to. She said that Clint ran away from Father's home three times. On one occasion, Clint contacted Mother to let her know that he was safe, but he insisted that he did not want to return to live with Father. Mother did not call Father to let him know that she knew of Clint's whereabouts.

Mother acknowledged that she allowed Clint to have a relationship with the nineteen-year-old woman, Garcia. She explained that she did not pay any tutoring expenses for Mark because she thought that the tutor was Lisa Murray's best friend and was providing the service at no charge. She admitted that, although ordered to get life insurance on her life, she did not do so until a contempt petition was filed against her, and that she had not yet provided Father with a copy of that policy. She also did not attend a parenting seminar, as ordered by the court, until a petition for contempt was filed against her. Mother asserted that she had a valid driver's license, and that she had driven herself to court, despite evidence proffered by Father that Mother's driver's license had been suspended since June 2000. Mother claimed that she did not know about the suspension. She also conceded that she had permitted Mark to drive her car while she was with him, though he was thirteen years old at the time.

Mother said that, in the past, she had worked as a paralegal for two law firms in Atlanta earning about $15 per hour. In March 2000, just before Father was designated as the boys' primary custodian, Mother said that she had a job with Astra Pharmaceuticals earning $37,922 per year. She testified that she quit that job, but did not explain her reasons for doing so. Mother said that, after she quit her pharmaceutical job, she worked in a series of lower-paying hourly-wage jobs, with none lasting longer than six or eight weeks. After Father was designated the children's primary custodian, Mother said, she lived in four or five different residences. Mother testified that, when the children were with her, she paid for their entertainment expenses, such as movies and meals.

Mother acknowledged that her child support payments were in arrears for the months of March, April, May, and June 2002. She noted that she had made her full payment in February, then paid $25 in March, $125 in April, $830 in May, and $878 in June. She represented to the trial court

that she was prepared to write a check for the amount that remained due, which the parties agreed was about $814, if the trial court held that such payment were appropriate.

Clint and Mark also testified. Clint indicated that his Father was overly strict, recounting an episode when he was fourteen years old in which Father tried to spank him for being out late. When Father attempted to spank him, he kicked Father in the stomach and wrestled with him, because he considered himself too old to be spanked. Clint says that he enjoys his relationship with Mother, because they spend time together as a family and "go places and just have fun." Clint admitted that Father was a hard worker who provided him with a home, clothes, and food. Clint believed, however, that Father did not care about him.

Mark also testified that he wanted to live with Mother. Mark said that, with Mother, he could express himself in good ways, and he felt that Father put him in the middle of controversies. Mark admitted that he had been in trouble while at Mother's house. He had broken into his neighbor's house, and he had sneaked out of Mother's house in the middle of the night. He also started a fire in a house that was being built next door. He admitted that, when he was thirteen years old, Mother gave him permission to drive her Jeep through her subdivision. Mark said that Father met with his teachers at school, and that Father is the parent whom teachers call when he gets in trouble.

The trial court also heard testimony from a clinical psychologist, Dr. Jack Gilliland ("Dr. Gilliland"), who had evaluated Clint. Dr. Gilliland submitted a report to the trial court dated June 12, 2001, regarding his assessment of Clint. In his report and testimony, Dr. Gilliland explained that he had been seeing Clint since April 2000 to determine whether Clint was clinically depressed. He also met with Clint, Father, and Mother together for family therapy. In his report, Dr. Gilliand concluded that Clint was not depressed. Rather, he concluded that Clint was "an egocentric, narcissistic, selfish and self-indulgent individual who is unwilling to accept responsibility for his behaviors." Though Mother saw Clint as being sensitive and caring, Dr. Gilliland opined that, to the contrary, "[h]e is a budding sociopath void of any internal, consistent rules that society accepts as being normal." At trial, Dr. Gilliland testified, consistent with his report, that Clint rebelled against Father's authority, and enjoyed Mother's household because of the lack of rules. He said that Clint "would go to any extreme to get what he wants when he wants it," and that he requires a disciplined environment. Accordingly, he felt that it would not be in Clint's best interest to live with Mother. He also stated, however, that if Clint could not accept Father's rules, "perhaps a group home could teach him discipline in a more appropriate manner that would allow Clint the opportunity to develop a better sense of Right from Wrong, and adhere to the Right."

On August 9, 2002, the trial court filed its memorandum opinion. The trial court found that Father "is the more credible witness and resolve[d] all disputed issues in favor of him." The trial court concluded that, as to Mark, that there had been no change in circumstances since June 2000, when this Court granted custody to Father. In the alternative, the trial court held that, even if there had been a change of circumstances, the evidence did not preponderate against the previous finding that Father was the more suitable person to have custody of Mark. Regarding Clint, the trial court acknowledged that "his relationship with Father has deteriorated to such an extent that Clint's love,

affection and emotional ties between himself and his father are strained, to say the least." The trial court also noted that, since Clint had been living in the Children's Home, his attitude and performance had improved. For those reasons, the trial court concluded that Clint's best interest would be served by remaining in the custody of the State and continuing to live at the Children's Home. Thus, the trial court denied Mother's request for custody of the children. The trial court also addressed Mother's request for a reduction in her child support payments. Though Mother argued that her income had decreased significantly since the initial child support award, the trial court found that Mother was willfully underemployed and was capable of maintaining the ordered amount of child support. Nevertheless, since the trial court was ordering that Clint remain in the custody of the Children's Home, the trial court reduced Mother's child support obligation by 50%, or $1,356 ($339 for March, April, May, and June), retroactive to March 16, 2002, when Clint went to live in the Children's Home. Thus, the trial court held that Mother owed Father a total arrearage of $5,832, which was Mother's total arrearage of $7,188,[5] less the retroactive reduction of $1,356.

With respect to the State's petition for contempt, the trial court found that Mother had "a lackadaisical attitude to secure employment which would allow her to meet her child support obligations." That attitude, the trial court found, constituted a willful and deliberate contempt of court. The trial court determined that Mother was in contempt for four separate violations -- for the months of March, April, May, and June 2002. As punishment, the trial court sentenced Mother to ten days imprisonment for each violation of the trial court's order, or forty days. On August 29, 2002, the trial court entered an order, incorporating by reference the findings and conclusions in its August 9, 2002 memorandum opinion. From that order, Mother now appeals.

On appeal, Mother argues that the trial court erred in declining to grant her custody of her children, and also in failing to reduce her child support payments. Mother also contends that the trial court erred in finding her in criminal contempt of court for failure to pay child support. She argues that the evidence submitted at trial did not show, beyond a reasonable doubt, that she had the ability to pay and that her failure to pay was willful.[6]

We review the trial court's conclusions regarding the change of custody and modification of child support *de novo* on the record, presuming the trial court's factual findings to be correct unless the evidence preponderates otherwise. ***Huntley v. Huntley***, 61 S.W.3d 329, 334 (Tenn. Ct. App. 1991); Tenn. R. App. P. 13(d). Regarding the finding of criminal contempt, we "must review the record to determine if the proof adduced at trial supports the finding of the trier of fact of guilt beyond a reasonable doubt." ***Levenhagen v. Levenhagen***, No. M1998-00967-COA-R3-CV, 2000 WL 1292446, at *7-*8 (Tenn. Ct. App. Sept. 14, 2000); *see **Thigpen v. Thigpen***, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993) (noting that an appellate court does not view the evidence in a light most favorable to the accused; rather, a finding of criminal contempt will be reversed only when the

---

[5]The $7,188 was comprised of the $6,374 pre-January 2002 arrearage plus the undisputed $814 due at the time of trial.

[6]The State did not file a brief or otherwise participate in this appeal. We do not address whether or to what extent either parent is responsible for paying child support to the State based on Clint's placement in State custody.

evidence does not support a conviction beyond a reasonable doubt); Tenn. R. App. P. 13(e). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. **Huntley**, 61 S.W.3d at 334.

We first address Mother's argument that the trial court erred in declining to grant her petition to change custody. A valid custody order is *res judicata* to requests for a change of custody, unless a material change of circumstances has occurred such that a change of custody would be in the best interest of the child. **See Cranston v. Combs**, 106 S.W.3d 641, 644 (Tenn. 2003). Though there are no "bright-line rules" for determining whether there has been a material change in circumstances, the Tennessee Supreme Court has identified several relevant considerations:

> (1) whether a change has occurred after the entry of the order sought to be modified; (2) [if so,] whether [the] change was not known or reasonably anticipated when the order was entered; and (3) whether the change is one that affects the child's well-being in a meaningful way.

*Id.*

In this case, Mother argues that since the June 2000 order granting custody to Father, both children suffered physical and emotional abuse while in Father's custody. Mother notes that Clint tried to run away from Father's home several times, and that Clint said that Father hit and choked him and grounded him for minor offenses. She claims that Father did not help Mark with his homework and once grounded Mark for six months.

At the trial in this cause, the trial court heard the evidence on which Mother relies to support her claims of Father's physical and emotional abuse, and concluded that the evidence was not credible. Rather, the trial court observed that Father is a strict disciplinarian, and that Mark has done well in school in the more structured environment in Father's household. Such credibility determinations lie within the sound discretion of the trial court, "and we routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary." **Scott v. Scott**, No. M1999-00322-COA-R3-CV, 2001 WL 266038, at *4 (Tenn. Ct. App. Mar. 20, 2001). Furthermore, Mother does not make any argument as to why Clint should not remain in State custody.[7] Rather, she merely argues that custody should be given to her because of the alleged change of circumstances. In deference to the trial court's determinations of credibility, we find that the evidence does not preponderate against the trial court's conclusion that there has been no change in circumstance affecting the children's welfare. Accordingly, we affirm the trial court's denial of Mother's petition for change of custody.

We next address Mother's argument that the trial court should have reduced her child support obligation in accordance with her reduction in income. The applicable standard for determining

---

[7] It is undisputed that, at the time this appeal was argued, Clint was living with a relative and was no longer in State custody. This arrangement is not addressed in this appeal.

whether an existing child support order should be modified is the "significant variance test" set forth in Tennessee Code Annotated § 36-5-101(a)(1), which provides in pertinent part:

> . . . In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered unless the variance has resulted from a previously court-ordered deviation from the guidelines and the circumstances which caused the deviation have not changed. . . .

Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 2003); *see Turner v. Turner*, 919 S.W.2d 340, 343 (Tenn. Ct. App. 1995). Thus, in order to obtain a decrease in child support, the obligor parent must show a "significant variance", or a difference of 15%,[8] "between the guidelines and the amount of support currently ordered." *Id.*; Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3); *see Coates v. Coates*, No. M2001-01928-COA-R3-CV, 2002 WL 31528512, at *2 (Tenn. Ct. App. Nov. 15, 2002).

In applying the significant variance test, the trial court must first determine the obligor's actual income to which the child support guidelines formula will be applied. *See Eatherly v. Eatherly*, No. M2002-00886-COA-R3-CV, 2001 WL 468665, at *3 (Tenn. Ct. App. May 4, 2001). In making that determination, the trial court is authorized to set the child support obligation based on the obligor parent's potential income, rather than on the obligor's actual income, when "the obligor has chosen to pursue an occupation or business venture which produces substantially less income than the parent is capable of earning." *Id.* at *4. The authorization for imputing income to an obligor parent is found in the following regulation:

> If an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience.

Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(3)(d). Whether the obligor parent is willfully unemployed depends on the particular facts of each case. *See Anness v. Chapdelaine*, No. M2000-01792-COA-R3-CV, 2001 WL 1077959, at *3 (Tenn. Ct. App. Sept. 14, 2001). Such a determination is a question fact, in which the trial court has considerable discretion. *Willis v. Willis*, 62 S.W.2d 735, 738 (Tenn. Ct. App. 2001). The burden is on the custodial parent to show that the obligor parent is willfully and voluntarily underemployed. *Eatherly,* 2001 WL 468665, at *11. The trial court must

---

[8]The applicable regulation provides:

> [A] significant variance shall be at least 15% if the current support is one hundred dollars ($100.00) or greater per month . . . . Such variance would justify the modification of a child support order . . . . Upon a petition for adjustment by either party, the court shall increase or decrease the award amount as appropriate in accordance with these guidelines . . . ."

Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3).

consider the obligor parent's past and present employment to determine whether the decision to take a lower paying job was made in good faith. *Willis*, 62 S.W.3d at 738. When an obligor parent voluntarily leaves his employment to accept a lower paying position, "courts are inclined to find willful and voluntary underemployment." *Id.*

In this case, the trial court held that Mother "is voluntarily under-employing herself and is capable of maintaining the previous child support amount . . . ." The evidence showed that through March 2000, just before Father was awarded custody in June 2000, Mother was working for Astra Pharmaceuticals earning $37,922 per year. Mother voluntarily quit that job in March 2000. Although we note that our Opinion in the prior appeal in this case describes the Astra Pharmaceuticals job as involving "frequent travel," Mother gave no explanation at trial for her decision to quit. *See Murray v. Murray*, 2000 WL 827960, at *5. Subsequently, Mother worked at several hourly-wage jobs, usually for no more than two months, earning far less than she did in her position at Astra Pharmaceuticals. At the time of trial, Mother was working forty hours per week at World's Gym as the nursery director earning $11 per hour. Mother indicated that the reason she has not maintained more regular employment since the time she filed her petition for a change of custody in June 2001 was because she had two miscarriages thereafter and has been "in and out of the hospital" about four times, for unspecified health problems. She claimed that she worked when she was able, and that in light of her health problems, she was not voluntarily underemployed.

After reviewing the record in this cause, we must conclude that Mother's evidence regarding her health problems is vague at best. She submitted no evidence regarding the specifics of the problems, and certainly no evidence that they were debilitating. Although she apparently relies on them to justify her unstable employment after voluntarily quitting Astra Pharmaceuticals, she provided little evidence supporting this assertion. Under these circumstances, we cannot conclude that the trial court erred in determining that she was willfully underemployed. We affirm the trial court's decision not to reduce Mother's child support obligation based on her reduction in income, although of course her child support obligation was cut in half beginning in March 2002 based on the fact that Clint was living in the Children's Home instead of with Father.

Mother's primary argument in this appeal is that the evidence does not establish beyond a reasonable doubt that her failure to pay child support was willful, and that, therefore, she should not have been found to have been in criminal contempt of court and sentenced to forty days imprisonment. "An act of contempt is a willful or intentional act that offends the court and its administration of justice." *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000). The contempt statute provides:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;

(2) The willful misbehavior of any of the officers of such courts, in their official transactions;

(3) *The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts*;

(4) Abuse of, or unlawful interference with, the process or proceedings of the court;

(5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or

(6) Any other act or omission declared a contempt by law.

Tenn. Code Ann. § 29-9-102 (2000) (emphasis added).  To find that a party's failure to pay child support was contemptuous under this statute, the court must determine that (1) the party had the ability to pay the required support, and (2) that the failure to pay was willful.  *Ahern*, 15 S.W.3d at 80; *see also Pierce v. Pierce*, No. M2001-01727-COA-R3-CV, 2002 WL 1343233, at *2 (Tenn. Ct. App. June 20, 2002) (citing *Ahern v. Ahern*, 15 S.W.3d at 80).

A finding of contempt can be either civil or criminal in nature.  *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996).  Civil contempt occurs when a person refuses to comply with an order of the court, and a contempt action is brought to coerce compliance with the order and enforce private rights.  Thus, where the punishment for civil contempt involves imprisonment, the contemnor "carries the keys to his prison in his own pocket . . . ."  *Id.* (quoting *State ex rel. Anderson v. Daugherty*, 191 S.W. 974, 974 (Tenn. 1917) (internal citations and quotations omitted)).  In contrast, "[p]unishment for criminal contempt is punitive in character; it is imposed to vindicate the authority of the law."  *State ex rel. Everson v. Gooch*, 1990 WL 3976, at *1 (Tenn. Ct. App. Jan. 24, 1990).  Punishment imposed for criminal contempt "is imposed unconditionally and the respondent cannot escape by purging himself of contempt."  *Id.*; *see Black*, 938 S.W.2d at 398.

In the instant case, the trial court held Mother in criminal contempt for her post-January 2002 noncompliance with the trial court's February 2001 child support order, and ordered her imprisoned for forty days, or ten days for each month she had violated the order – March, April, May, and June 2002.  It is undisputed, however, that Mother was in jail at the end of January and the beginning of February 2002 for contempt of the trial court's February 2001 order to pay child support.  Upon her release from prison, she was unemployed.  Mother paid the entire $678 support obligation in February 2002.  She paid $25 in March, $125 in April, $830 in May, and $878 in June -- a total payment of $1,858 for the four months in question.  However, at the conclusion of the trial in which Mother was found in contempt of the February 2001 order, the trial court determined that Mother owed only $339 per month, retroactive to March 16, 2002, the date on which Clint was sent to live at the Children's Home.  This made her total child support obligation due for the four months in

question approximately $1,356. Therefore, Mother actually overpaid her child support obligation for the four month period in which she was found in contempt. Under all of these circumstances, we must conclude that the record does not support the trial court's finding that Mother was in criminal contempt of court for willfully failing to meet her child support obligation. Consequently, this finding must be reversed.

The decision of the trial court is affirmed in part and reversed in part as set forth above, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed equally to Appellant Alma D. (Murray) Neiswinter, and her surety, and Appellee Mark K. Murray, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE